STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JOHN TAYLOR, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JOHN SHANNON, Jr., DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. EDWARD LEE TAYLOR, DEFENDANT-APPELLANT.

Decided February 7, 1966.

318

*Mr. Maurice Y. Cole, Jr.,* argued the cause for appellant John Henry Taylor.

*Mr. Robert H. Davisson* argued the cause for appellant John Shannon, Jr.

*Mr. Albert F. McGee, Jr.,* argued the cause for appellant Edward Lee Taylor.

*Mr. Solomon Forman,* Assistant County Prosecutor, argued the cause for respondent (*Mr. Augustine A. Repetto,* Atlantic County Prosecutor, attorney; *Mr. Ernest M. Curtis,* of counsel and on the brief; *Mr. Solomon Forman* on addendum to the brief).

The opinion of the court was delivered by

PROCTOR, J. The defendants, John Henry Taylor, John Shannon and Edward Lee Taylor, together with six other defendants, John Sanders, Bobby Hines, Vernon James, Thomas Ross, Oscar Bernard and Ernest Taylor, were convicted of sodomy (*N. J. S.* 2A:143-1) in a joint trial before a jury in the Law Division of the Superior Court, Atlantic County. John Henry Taylor, Shannon and Edward Lee Taylor appealed, and the Appellate Division ordered the ap-

peals consolidated. Before argument in that court we granted the State's motion for certification pursuant to *R. R.* 1:10–1A.

The nine defendants were indicted separately for sodomy.[1] The State moved to consolidate all the indictments for the purpose of trial on the ground that the alleged offenses occurred at about the same time and the same place and upon the same victim. The defendants opposed this motion and requested separate trials contending, as one of several grounds, that the confession of Edward Lee Taylor named his codefendants as participants in the crime and would prejudice them if introduced in evidence at a joint trial. After hearing the testimony of the alleged victim, George Ellerbee, the trial court granted the State's motion for consolidation without examining Taylor's confession. However, the court did express the opinion that proper limiting instructions would adequately protect Edward Lee Taylor's codefendants if the confession were admitted into evidence.

The essential facts developed by the State at the trial are as follows: Ellerbee was an inmate in the Atlantic County jail where he, and about twenty others, including the nine defendants, were confined to the second floor of the east tier. The doors to the seven cells in this tier did not lock and consequently the inmates were permitted to roam freely around the tier at all hours, to sleep in any bunk that was vacant and to change cells whenever they liked. Ellerbee, who was sharing Cell 6 with Nelson Boyer and Jaico Ruiz, testified that in the early morning of May 15, 1963, the defendants came into his cell. They dragged him out, put a gag in his mouth and a blanket over his head and took him into Cell 7 which was unoccupied because the toilet there had been ripped out. During the struggle the blanket fell off his head. Ellerbee testified that he was forcibly held down while each defendant committed the crime against his person. Al-

---

[1] The nine defendants were also indicted for conspiracy to commit sodomy, and two of them were indicted for aiding and abetting. On the State's motion these indictments were dismissed during the trial.

though the lights in the tier had been turned off for the night, Ellerbee stated that he was able to identify his assailants because the ripped-out toilet permitted enough light to come through from the still lighted toilet runway in back of the cell. After the defendants had left him, Ellerbee lay on the floor unable to get up. Boyer picked him up and carried him back to Cell 6, and soon thereafter Ellerbee made a complaint to the guards who then took him off the tier.

Boyer testified that he left Cell 6 and went to Cell 7 about five minutes after Ellerbee had been removed by the defendants. He generally corroborated the testimony of Ellerbee, both as to the occurrence of the crimes and the identity of the assailants. Jaico Ruiz, the third occupant of Cell 6, testified that Ellerbee was dragged out of the cell by several inmates but that he was unable to identify them because of the dark. However, Ruiz contradicted Boyer's statement that he was present in Cell 7 when the crimes occurred. Ruiz said that Boyer did not leave Cell 6 until he went to help Ellerbee about an hour after he was dragged from the cell. Three jail guards on duty that morning testified that Ellerbee was removed from the tier because of the complaint made by him.

Three physicians testified regarding their examination of Ellerbee's rectum. Dr. Cohen, the jail physician, testified that he was requested to evaluate Ellerbee's condition. His examination at 2:00 P. M. on May 15 revealed "a few skin tabs over the anal area" but no evidence of laceration, bleeding, swelling or inflammation. However, he stated that the acts alleged to have been committed by the defendants would not necessarily cause any injury to the anus. Because he was unequipped to make an internal examination, he referred Ellerbee to the Atlantic City Hospital for a more thorough evaluation. Two days later at the hospital, Dr. Arriola found a slight swelling of the anal orifice "with much spasm and tenderness" but no "fissure or laceration." Neither Dr. Cohen nor Dr. Arriola prescribed any medication or treatment. Dr. Davidson, Ellerbee's personal physician, examined him on June 8, 1963, and found "nothing of any pathological sig-

nificance" although he appeared subjectively tender. Ellerbee appeared tense and the doctor prescribed a sedative.

The State offered in evidence oral and written statements of Thomas Ross and Edward Lee Taylor, one of the appellants here, and the court in the presence of the jury heard testimony regarding the voluntariness of these statements.

Joseph Venuti, a State Trooper, testified that he commenced investigating Ellerbee's complaint on the morning of May 15, 1963, and interviewed most of the inmates of the second tier east during the course of the day. That night he conducted a second interview of Ellerbee and Boyer at the State Police barracks at Mays Landing, about a mile from the jail. At 2:00 A. M. on May 16, he, with Trooper Mauer, picked up Edward Lee Taylor at the jail and drove him to the barracks, where he questioned him for about an hour and a half in the main room in the presence of Troopers Hendrickson and Darby. Venuti testified that Taylor was not harmed or threatened in any way, and that no promises had been made to him. However, he admitted that no one advised Taylor either that he had a right to remain silent or that anything he said could be used against him. At the end of the interrogation Taylor orally admitted committing sodomy upon Ellerbee. He was then returned to the jail at about 4:00 A. M., and Ross was picked up and driven to the barracks. He was interrogated for about an hour in the main room where Hendrickson and Darby were still present. Venuti testified that Ross was not harmed or threatened and that no promises were made to him. However, Ross was not advised of any of his constitutional rights. At the end of this questioning Ross orally stated that he had participated in the crime against Ellerbee. Venuti testified that at 12:30 P. M. on May 16 he returned to the jail with Trooper Hurden and drove Edward Lee Taylor back to the State Police barracks. After Taylor was advised that any statement he made could be used against him, he executed a written confession in the presence of Venuti and State Police Sergeant Cavileer in which he admitted that he, along with the other defendants,

committed sodomy against Ellerbee. Venuti further testified that Ross did not make a written statement until May 27 when he denied participating in the crime and contradicted his earlier oral statement. The other State policemen corroborated Venuti's testimony that the statements of Edward Lee Taylor and Ross were voluntarily given.

Edward Lee Taylor and Ross both testified that they had been beaten before they made their oral statements. Each testified that he was punched by the troopers while being taken from the jail to the barracks. Ross claimed that he had suffered a broken jaw. Several inmates testified that they had seen the troopers beating Taylor and Ross while they were being taken out of the jail. Taylor's mother and a Reverend Arthur Harris testified that on May 19 they visited Taylor and observed that one side of his face was swollen and that his eyes were bloodshot. Ross was treated for a fractured jaw at the Atlantic City Hospital on May 16. However, all the State Troopers denied that either Ross or Taylor was mistreated in any way at any time. In this they were corroborated by a deputy sheriff and several jail guards. The State introduced evidence that Ross's broken jaw resulted from a fight among the inmates after which his cellmate, Mayo, had been removed from the tier, and on May 19 Ross signed a statement admitting that his injury was so caused.

After considering all the evidence the trial judge concluded that the written and oral statements of Taylor and Ross were voluntarily given. The court admitted Edward Lee Taylor's written confession and Ross's written statement into evidence with the limiting instruction that each was admissible only against the declarant. The oral confessions given by Ross and Taylor were also recounted by Trooper Venuti, this testimony being admitted subject to the same limiting instruction.

All of the defendants except Shannon took the stand and denied committing sodomy. Edward Lee Taylor and Ernest Taylor testified they went to sleep before twelve o'clock and did not know of the alleged assault on Ellerbee until the next morning. Sanders and John Henry Taylor testified that they

were in their bunks and knew only that there had been some commotion in the tier during the night. Bernard and James testified that they slept all that night except when they were awakened on two occasions, first by Mayo and then by Ellerbee calling for the guards to take them off the tier. James also testified that on May 14 he saw Boyer on top of Ellerbee in an act of sodomy. He said he told the others about what he had seen, and that later they had laughingly made remarks about it to Boyer and Ellerbee. Hines testified that he slept all night except for one brief interruption when someone shook him. He also testified that he often saw Boyer and Ellerbee with their arms around each other. Ross testified that he was awakened by a noise, and although he said he had nothing to do with the crime, he saw some men whom he could not identify attacking Ellerbee in Cell 7.

The defense called three other inmates, Brown, Hall and Delaney. Brown testified that nothing could be seen in the cells at night other than the lights in the toilet seats. However, he did not testify about the conditions in Cell 7. He also said that Ellerbee told him he was going to sue the county for damages. Hall testified that he was the cellmate of Hines and John Henry Taylor and that they never left the cell during the time the attack on Ellerbee was alleged to have occurred. However, his testimony was discredited when he was confronted with a prior inconsistent statement he had made to a member of the prosecutor's office. Delaney testified that after the alleged attack Ellerbee had told him "the lights were out completely, and that he couldn't actually tell who the boys were, but he know [sic] that it was some of the fellows on the tier, and that he was going to get even with them."

The defense also called two prison guards who testified that the lights in the cell block generally go out at 10:00 P. M., after which only a small amount of light comes through the toilet fixtures from the toilet runway. They both testified that because of the dimness it would be difficult to see anyone's face. However, they admitted that they had not been inside

the cells at night but had only looked into them from the corridor.

Dr. Samuel Dinenberg, a specialist in neuropsychiatry, testified that he had examined Ellerbee on behalf of the defense. He diagnosed Ellerbee as suffering from a psychopathic personality disorder involving the loss of any moral sense, any social responsibility or any sentiment which would involve the conscience of ordinary human beings. He also pointed out that Ellerbee had been under psychiatric care when he had previously been confined at Annandale Reformatory.

In rebuttal, the State called Ellerbee and Boyer who testified that they never had a homosexual relationship.

## I.

Edward Lee Taylor's graphically descriptive written confession,[2] which specifically identified John Henry Taylor and John Shannon as two of Ellerbee's assailants, was offered into evidence by the State. Prior to its admission, defense counsel moved to exscind references to Edward Lee Taylor's codefendants. After hearing argument the motion was denied by the trial court, and the confession was admitted with instructions to the jury that it had probative value only against the declarant. This limiting instruction was repeated in the

---

[2] In its pertinent parts, it reads as follows:

"Q. Directing your attention to the early morning hours of May 15th., 1963, will you please relate any information in your possession concerning this crime?

A. I was laying in bed and I heard some noises in the back of the cell block. When I got out of my bed and went back there, Oscar Bernard was getting off Ellerbee, so Bernard told me to go ahead and get off, which means to go ahead and [commit sodomy]. I got on Ellerbee and [committed sodomy]. Then I got off and Thomas Ross wanted to go again but Bernard said no because he had already gone first. Then John Shannon got on Ellerbee and when he got up Vernon James got on, and when James got up, John Taylor got on, and when John Taylor got up, Ernest Taylor got on. While we were [committing sodomy against Ellerbee], John Sanders and Bobby Hines were holding George Ellerbee's arms. After everybody got done we all run back to our cells and went to sleep. Later I heard Ellerbee calling for the turnkey, then they took him out of the cell block."

trial court's closing charge. John Henry Taylor and John Shannon contend, and we agree, that the denial of the motion to exscind requires a reversal of their convictions.

The problems arising from the State's use of a confession of one defendant in a joint trial were recently before this court in *State v. Young*, 46 *N. J.* 152 (1965). There we held that when a defendant moves to eliminate all references to himself from a codefendant's statement, which the prosecution proposes to place in evidence, the trial court must grant such motion. We pointed out that limiting instructions are of doubtful value in guiding the jury's deliberations and are not an adequate substitute for deletion. *Id.*, at *p.* 157. Since the ability of Ellerbee and Boyer to identify the assailants in the darkened jail was sharply disputed, and since the credibility of both of these witnesses was attacked, the admission of Edward Lee Taylor's unexscinded confession created a substantial potentiality for prejudice to the defendants named therein, each of whom denied his participation in the crime.

■ For the above reasons we conclude that the defendants, John Shannon and John Henry Taylor, must be granted new trials. However, the joint trial itself caused no prejudice to the confessing defendant, Edward Lee Taylor, and his conviction cannot be reversed, either for the trial court's action in ordering a consolidation or for its failure to grant the requested excisions from his own confession. See *State v. Jackson*, 43 *N. J.* 148, 164–165 (1964) ; *State v. Manney*, 26 *N. J.* 362, 368 (1958).

In the present case the trial judge did not examine Edward Lee Taylor's confession when considering the State's motion for consolidation. However, we note that in *State v. Young, supra,* a procedure was set forth by which the questions of severance and excision would be determined together prior to the commencement of trial. *Id.*, at *pp.* 158–159.

## II.

Edward Lee Taylor gave an oral and a written confession to the State Police, both of which were admitted into evi-

dence at the trial. Taylor contends that these confessions were given without the advice of counsel and that their admission violated his rights under the Sixth and Fourteenth Amendments of the Constitution as interpreted by the United States Supreme Court in *Escobedo v. State of Illinois*, 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed.* 2d 977 (1964). He also contends that his confessions were involuntarily given as a result of police coercion.

At about 2:00 A.M. on May 16, about 24 hours after the alleged crime, two state policemen took Taylor from the Atlantic County jail to Mays Landing State Police barracks. There he was questioned for an hour and a half when he orally admitted committing sodomy against Ellerbee. At 4:00 A. M. the troopers returned Taylor to the jail and brought Ross back to the barracks. After being questioned for about an hour, Ross orally admitted his participation in the sodomy. Neither defendant was advised on that morning that he had a right to counsel, that he had a right to remain silent or that anything he said could be used against him.

Edward Lee Taylor's written confession was given early in the afternoon on May 16. Before signing it he was advised that anything he said could be used against him, but he was not warned that he had a right to legal assistance or a right to remain silent. Ross never gave a written confession; rather, on May 27 he signed a statement in which he denied any complicity in the crime. Taylor, Ross and the other seven defendants were not brought before a magistrate until May 23.

It is undisputed that Edward Lee Taylor never requested an opportunity to confer with an attorney. We have consistently held that in the absence of a specific request for counsel, *Escobedo v. State of Illinois, supra*, is inapplicable. *E.g., State v. Billingsley*, 46 *N. J.* 219 (1966) ; *State v. Green*, 46 *N. J.* 192 (1965), and *State v. Coleman*, 46 *N. J.* 16 (1965). Moreover, we have held that a confession obtained during police interrogation may be admissible even though the accused was not advised of his right to remain silent and

not advised that anything he said could be used against him. *State v. Ordog*, 45 *N. J.* 347, 361-362 (1965). In the absence of a request for legal assistance, the ultimate test of a confession's admissibility is its voluntariness. Failure to advise a suspect or an accused of his constitutional rights is a factor to be considered on the issue of voluntariness and weighed against all the other circumstances of the interrogation. *State v. Billingsley, supra*, 46 *N. J.*, at *p.* 236; *State v. Ordog, supra; State v. Reynolds*, 41 *N. J.* 163, 180 (1963).

Nearly a third of this very lengthy trial was devoted to the reception of evidence concerning the voluntariness of Taylor's and Ross's statements. After hearing a mass of conflicting testimony the trial judge ruled that all the statements had been voluntarily given and thus admissible in evidence. We have carefully reviewed the voluminous record in accordance with the standard set forth in *State v. Smith*, 32 *N. J.* 501, 549 (1960), *certiorari denied* 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961) and are satisfied that the State has met its burden of establishing that Taylor's confessions were not the result of physical or psychological coercion and that the fundamental fairness requirement of the due process clause was not violated. See *State v. Fauntleroy*, 36 *N. J.* 379, 395 (1962).

Although the failure of the police to take these already incarcerated defendants before a magistrate for eight days may have constituted a violation of *R. R.* 3:2–3(a), a confession taken during this period is not *per se* inadmissible. *State v. Jackson*, 43 *N. J.* 148, 167-168 (1964). Since both Taylor's oral and written confessions were given the day after the alleged crime, the delay in bringing him before a magistrate could not have played a role in inducing him to confess.

Taylor gave his oral confession while being questioned at the State Police barracks between two and four o'clock in the morning of May 16, and he urges this early morning interrogation as corroborative of the claim that his confessions were coerced. However, this interrogation was not an isolated incident designed to catch Taylor by surprise, but part of a

continuous investigation which started on the morning of May 15, an investigation of which Taylor was fully aware. The period of interrogation was short. Taylor was over 21 years of age, not mentally defective and not a stranger to the criminal process. At the time of the alleged sodomy he was in the Atlantic County jail awaiting trial on a charge of robbery, a crime for which he was subsequently convicted. In light of these circumstances it cannot be said that the unusual hour of the interrogation would have been sufficient to overbear his will. See *State v. Puchalski*, 45 *N. J.* 97 (1965). Ultimately the determination of the voluntariness of Taylor's confessions rests on an evaluation of the credibility of witnesses who testified before the trial court, an evaluation which the trial court is best able to make. Several of Taylor's fellow inmates at the jail, his mother and a minister gave testimony tending to show that he was physically abused by the troopers. On the other hand, seven state policemen, two jail guards, a deputy sheriff and a police detective all gave testimony that Taylor was not in any way mistreated. We are convinced from a study of the record that the trial court was correct in finding that Taylor's confessions were voluntarily given. See *State v. Billingsley, supra,* 46 *N. J.,* at *p.* 233; *State v. Ordog, supra, State v. Smith, supra.*

Ross, who is not an appellant here, also claimed that his oral confession to the police had been coerced, and it is undisputed that on the same day that he confessed he was taken to the hospital with a broken jaw. However, the State produced evidence that the injury had been the result of a fight among the inmates. Indeed, Ross himself signed a statement to that effect on May 19. Since the trial judge ruled that Ross's confession was voluntary, we are not confronted with the situation which arose in *State v. Tassiello,* 39 *N. J.* 282 (1963). There two defendants confessed after being interrogated by the police. At the trial both claimed that the confessions had been coerced by the use of physical violence, a claim which the police denied. The trial judge concluded that the confession of one defendant was coerced while the other was volun-

tarily given. On appeal this court decided that the trial judge's determination was implausible since it had to rest on the conclusion that the police had lied when they denied mistreating one defendant and told the truth when they gave similar testimony about the other. *Id.*, at *pp.* 294–296. In the present case there is no implausibility in the trial judge's determination as he found that both Edward Lee Taylor and Ross had confessed voluntarily.

### III.

On May 15, 1963, at 2:00 P. M., about 12 hours after the alleged sodomy, Ellerbee was examined by Dr. Cohen, the jail physician. On the morning of May 17 he was examined by Dr. Arriola at the Atlantic City Hospital, and on June 8, 1963, after he had been released from jail, he was seen by his personal physician, Dr. Davidson. When the State attempted to question the doctors about Ellerbee's complaints to them the trial court sustained the defendants' objections that their testimony on this point would be hearsay. However, over the objections of the defendants, the written reports of these doctors were later admitted into evidence as business records pursuant to the Uniform Business Records as Evidence Act, *N. J. S.* 2A:82–34 *et seq.* Dr. Cohen's record includes a statement by Ellerbee that he was forced to sodomy by eight cellmates. The records of Dr. Arriola and Dr. Davidson include similar statements, except that Ellerbee told each of these doctors that there were nine attackers. The defendants maintain that the admission of these records was error, while the State argues that these records were properly received under either the Uniform Business Records as Evidence Act or the "treating physician" exception to the hearsay rule.

When doctors' records contain statements given to the entrant by one under no duty to render an honest report, such statements are not admissible under the Uniform Business Records as Evidence Act. As stated by Professor McCormick:

"It seems clear that such use of the statement cannot be supported under the business records exception to the hearsay rule, since the patient * * * did not make the statement in the course of a business duty or routine. However, it may still be receivable to prove the facts stated, if it can qualify under any other exception to the rule against hearsay." *McCormick, Evidence* § 290 (1954).

See also *Gilligan v. International Paper Co.*, 24 *N. J.* 230, 238 (1957); *Fagan v. City of Newark*, 78 *N. J. Super.* 294, 319 (*App. Div.* 1963); *Johnson v. Lutz*, 253 *N. Y.* 124, 170 *N. E.* 517 (*Ct. App.* 1930). Ellerbee was certainly under no "business duty" to make an honest report to the doctors of the events which caused his condition.

It has long been held in this State that declarations of a patient as to his condition, symptoms or feelings, made to a physician for the purpose of diagnosis and treatment, are admissible in evidence. This departure from the hearsay rule has been sanctioned because the law recognizes that such statements are made at a time when the desire for relief furnishes an incentive for telling the truth. *State v. Gruich*, 96 *N. J. L.* 202 (*E. & A.* 1921). However, it has also been held that statements as to the cause of the symptoms or condition are not within the exception because the same compelling motivation may not be present. *Helminsky v. Ford Motor Co.*, 111 *N. J. L.* 369 (*E. & A.* 1933); *State v. Gruich, supra;* see 6 *Wigmore, Evidence* (3d ed. 1940) § 1722; *McCormick, Evidence* § 266 (1954).

. In New Jersey and other jurisdictions there has been a tendency in workmen's compensation cases to relax the hearsay rule and to admit statements made by a patient to a treating physician concerning the cause of his condition. *Bober v. Independent Plating Corp.*, 28 *N. J.* 160 (1958); *Greenfarb v. Arre*, 62 *N. J. Super.* 420 (*App. Div.*) certif. denied 33 *N. J.* 454 (1960); 6 *Wigmore, Evidence* (3d ed. 1940), § 1722, p. 77. In *Barrie v. Central R. R. Co. of New Jersey*, 71 *N. J. Super.* 587 (*App. Div.* 1962), certif. denied 37 *N. J.* 87 (1962) the hearsay rule was similarly relaxed in a tort action. There the declarant had fallen off a moving

train and had made his statements to the doctor shortly after his removal to the hospital. The court found that the statements were made under circumstances importing "spontaneous motivation for truthfulness," that the declarant, because ofamnesia, was unavailable to testify and that there was no other source of similar information. *Id.,* at *p.* 596. See also *Greenfarb v. Arre, supra,* at *pp.* 434, 437.

In a criminal case where a person's life or liberty is at stake and guilt must be proved beyond a reasonable doubt, a court should be reluctant to broaden the scope of an exception to the hearsay rule unless the type of statement sought to be admitted carries with it strong and convincing indicia of trustworthiness. Further, this reluctance should be particularly great when the declarant, like Ellerbee, is available and able to testify at the trial.

No inflexible rule concerning the use of statements made to a treating doctor as to the cause of a patient's ailments need be laid down at this time. It is enough to say that we do not think the parts of the doctors' reports referring to Ellerbee's complaints that he was the victim of a forcible sodomy by eight or nine of his fellow prisoners carry with them earmarks of reliability sufficient to justify their admission in a criminal trial. There is no suggestion that Ellerbee requested the services of either Dr. Cohen or Dr. Arriola. In fact, the examinations were conducted at the request of the jail authorities for the purpose of evaluating his condition. Thus, it cannot be said that Ellerbee's motivation for telling the truth to these two doctors was as strong as it would have been had he actively sought their medical care. Ellerbee's statement to Dr. Davidson was not given until he was examined more than three weeks after the alleged crime. There was a great deal of time for Ellerbee to ponder the events of May 15, and had he been inclined to fabricate he would have had an ample opportunity to do so. See *Greenfarb v. Arre, supra,* at *p.* 434. We cannot find that any of Ellerbee's three statements was made under circumstances importing a "spontaneous motivation for truthfulness." See *Bober v. Inde-*

*pendent Plating Corp., supra,* at *p.* 172; *Barrie v. Central R. R. Co. of New Jersey, supra,* at *p.* 596.[3]

Although we think that the parts of the doctors' records containing Ellerbee's claim that he was the victim of sodomy by eight or nine of his fellow prisoners should not have been admitted at the trial and should not be admitted at the retrial of John Henry Taylor and John Shannon, we do not find that their admission justifies reversing the conviction of Edward Lee Taylor. As with error generally, there must be an evaluation of its capacity for improper impact on the jury in the circumstances of the case. *State v. Johnson,* 46 *N. J.* 289 (1966). None of the doctors' reports mentioned any of the defendants by name. Ellerbee himself testified in detail at the trial concerning Edward Lee Taylor's part in the crime, and there was a great deal of other competent evidence corroborating Ellerbee's claim that he was attacked by inmates of the Atlantic County jail. But of most importance, Taylor confessed committing an act of sodomy against Ellerbee, a confession which we have found to be voluntary. In light of these circumstances, we are satisfied that the improper admission of the doctors' records could not have prejudiced the jury in their determination of Edward Lee Taylor's guilt or innocence. See *R. R.* 1:5–1.

## IV.

The defendants contend that the trial judge erred in refusing to grant their motion for a jury view of Cell 7 where the sodomy allegedly took place. *N. J. S.* 2A:77–1 provides that in a civil or criminal case the court may order "that the jury view the lands, places or personal property in question if

---

[3] The State does not contend that Ellerbee's declarations to the doctors are admissible under the "fresh complaint" rule which generally applies in rape cases. See, *e. g., State v. Gambutti,* 36 *N. J. Super.* 219, 225 (*App. Div.* 1955). In fact, the defendants at the trial informed the judge that they would not challenge the State's contention that Ellerbee complained to the jail guards shortly after the alleged sodomy.

it will enable the jury better to understand the evidence." Whether a view will be necessary or helpful in any given case rests within the trial court's sound discretion. *State v. Coleman,* 46 *N. J.* 16, 25–26 (1965), and cases cited therein.

In the present case the jury had available for their consideration a diagram and several photographs of the cell block and the testimony of several witnesses who described the premises. It is thus unlikely that the jurors would have had any difficulty in visualizing the scene of the crime. In these circumstances the trial court's denial of a jury view was not improper and did not result in any prejudice to the defendants. See *R. R.* 1:5–1.

## V.

In the course of his charge to the jury the trial judge read the indictment of each defendant. The defendants now contend the wording used in the indictments was inflammatory and prejudicial. There is no merit to this contention. The form of the indictments is similar to that which has always been used in this State and which was approved in *State v. Pitman,* 98 *N. J. L.* 626 (*Sup. Ct.* 1923), affirmed 99 *N. J. L.* 527 (*E. & A.* 1924). See also 3 *Schlosser, Criminal Laws of New Jersey* 1458, Form 410 (1953).

## VI.

The defendants contend that the trial judge erred in refusing the request to charge the jury that emission is an essential element of the crime of sodomy. Since *N. J. S.* 2A:143–1, the applicable statute, does not define the crime, the definition must be obtained from the common law. *State v. Morrison,* 25 *N. J. Super.* 534, 536 (*Cty. Ct.* 1953). Although no New Jersey court has passed upon the question, the overwhelming weight of authority in other jurisdictions is that emission is not required. 2 *Wharton's Criminal Law (Anderson* 12 *ed.* 1957), § 753 and cases collected at footnote 3. We can find no logical reason for the contrary rule and

hold, therefore, that emission is not an essential element of sodomy.

## VII.

During the course of his summation the prosecutor made several graphic references to the nine defendants. None of them, however, objected to the prosecutor's remarks at the trial, although it is now urged that these remarks were inflammatory and prejudicial and constitute plain error.

In *State v. Johnson,* 31 *N. J.* 489, 511 (1960), we discussed the weight to be given a defendant's failure to make a timely objection:

"[A]n appellate court, limited in its review to the printed record, may infer from counsel's failure to object to the remarks at the time they were made that he did not in the atmosphere of the trial think them out of bounds."

Our examination of the record satisfies us that the prosecutor's remarks were a fair response to the summations of defense counsel. Far from constituting plain error the prosecutor's summation was limited to reasonable comment on the evidence and was entirely proper. See *State v. Johnson, supra; State v. Cioffe,* 128 *N. J. L.* 342 (*Sup. Ct.* 1942) affirmed 130 *N. J. L.* 160 (*E. & A.* 1943) ; *State v. Lang,* 75 *N. J. L.* 1 (*Sup. Ct.*) affirmed 75 *N. J. L.* 502 (*E. & A.* 1907), affirmed 209 *U. S.* 467, 28 *S. Ct.* 594, 52. *L. Ed.* 894 (1908).

## VIII.

The defendant, John Shannon, did not take the stand in his own behalf, and in his charge the trial judge told the jury that they could infer from his failure to testify that he could not truthfully deny the inculpatory facts adduced against him. The trial judge relied on *State v. Corby,* 28 *N. J.* 106 (1958), and *N. J. S.* 2A:84A–17(4), which then permitted this type of comment. Subsequent to the trial, the United

States Supreme Court ruled that such comment violates a defendant's rights under the Fifth and Fourteenth Amendments, *Griffin v. State of California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed. 2d* 106 (1965), and we have held that the rule in *Griffin* would be applied to cases on direct appeal. *State v. Lanzo,* 44 *N. J.* 560 (1965). Shannon now urges that the trial court's charge is an additional ground for reversal. The State contends, however, that the comment of the judge was justified by the summation of Shannon's counsel in which he attempted to explain why his client did not take the stand. *Cf. State v. Schultz,* 46 *N. J.* 254 (1966) ; *State v. Lanzo, supra,* at *p.* 563. Since we have already determined that Shannon is entitled to a new trial, since the law under which the trial judge acted (*Corby* and *N. J. S.* 2A:84A–17(4)) is no longer applicable and since it is unlikely that a similar situation will arise when Shannon is retried, we need not decide the merits of the State's contention.

## IX.

We have considered the other points raised by the defendants and find them to be without merit.

For the reasons stated above the convictions of John Henry Taylor and John Shannon are reversed, and the conviction of Edward Lee Taylor is affirmed.

*For reversal and remandment of convictions of John Henry Taylor and Shannon*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For affirmance of conviction of Edward Lee Taylor*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and HANEMAN—5.

*For reversal of conviction of Edward Lee Taylor*—Justice HALL—1.