**UNITED STATES of America ex rel. Edgar H. SMITH**

v.

**Howard YEAGER, Warden, New Jersey State Prison, Trenton.**

**Civ. No. 766-65.**

United States District Court, D. New Jersey.

May 13, 1971.

Steven M. Umin, David N. Webster, (of Williams & Connolly, Washington, D. C., for petitioner.

Stephen F. Lichtenstein, Trenton, N. J., of counsel.

Robert Dilts, Bergen County Prosecutor, Edward N. Fitzpatrick, Hackensack, N. J., Harold N. Springstead, Dumont, N. J., on the brief, for respondent Yeager.

## OPINION and ORDER

GIBBONS, Circuit Judge.*

Petitioner Edgar Smith is before the court seeking a writ of habeas corpus. His petition was filed in 1965. He is confined in the New Jersey State Prison at Trenton awaiting the execution of a death sentence imposed by the Bergen County Court on June 4, 1957, after a jury trial for murder. Since that time petitioner has sought unsuccessfully to have the conviction set aside.[1] Heretofore this court, without an evidentiary hearing on the allegations of the petition, relying on the contents of the state court trial record, declined to issue the writ. The Third Circuit Court of Appeals affirmed, holding that petitioner's attorney had waived a federal evidentiary hearing. United States ex rel. Smith v. Yeager, 395 F.2d 245 (3 Cir. 1968). The Supreme Court reversed. Smith v. Yeager, 393 U.S. 122, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968). The case was then remanded to this court for reconsideration of petitioner's request for such a hearing. Following the remand petitioner's attorney, relying on Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968), urged that even on the state court record the totality of

---

* Sitting in the United States District Court by designation.

1. Petitioner's conviction was affirmed by the Supreme Court of New Jersey. State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958). A petition for habeas corpus was subsequently dismissed by the United States District Court for failure to exhaust state remedies. A motion for a new trial chiefly on the ground of newly discovered evidence was denied, and the denial affirmed by the Supreme Court of New Jersey. State v. Smith, 29 N.J. 561, 150 A.2d 769 (1959), cert. denied, 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959). Habeas corpus was again sought and denied in the district court. United States ex rel. Smith v. New Jersey, 201 F.Supp. 272 (D.N.J.1962), aff'd, 322 F.2d 810 (3d Cir. 1963), cert. denied, 376 U.S. 928, 84 S.Ct. 678, 11 L.Ed. 2d 623 (1964). A Petition for Post-Conviction Relief was denied by the Bergen County Court on April 17, 1964 and that denial was affirmed by the New Jersey Supreme Court. State v. Smith, 43 N.J. 67, 202 A.2d 669 (1964), cert. denied, 379 U.S. 1005, 85 S.Ct. 731, 13 L.Ed.2d 706 reh. denied, 380 U.S. 938, 85 S.Ct. 945, 13 L.Ed.2d 826 (1965). A subsequent application for post-conviction relief was denied by the Bergen County Court on March 29, 1965, and leave to appeal was denied by the New Jersey Supreme Court on April 13, 1965. A Petition for Reconsideration was denied on June 22, 1965.

circumstances surrounding the taking of a statement by petitioner used in evidence against him at the trial compelled the issuance of the writ. On August 3, 1970, this court ruled that it was bound by a prior ruling of the Third Circuit[2] upholding the conclusions of voluntariness based on the state court record.

That state court trial was the only previous opportunity petitioner had to present evidence on his Fifth Amendment claim. On November 30, 1970, this court ruled that evidence crucial to the adequate consideration of that claim was not fully developed in that record, and that an evidentiary hearing must be held. 28 U.S.C. § 2254(d) (3); Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The November 30, 1970, opinion also delimited the scope of the factual issues to be determined. At issue is the voluntariness under federal constitutional standards of all admissions by petitioner which were used against him in the course of his state court murder trial. These admissions may be divided for purposes of discussion into the following categories:

1. Verbal admissions made by petitioner while in the company of various police officials operating at and out of the police headquarters, Mahwah, New Jersey, between the time he was taken into custody at Ridgewood, New Jersey at about 11:30 p. m. on March 5, 1957, and the time he was taken to the office of the Bergen County Prosecutor in Hackensack, New Jersey, at about 8:30 a. m. on March 6, 1957. Various police officers testified at the trial to such admissions.

2. Verbal admissions made during petitioner's interrogation at the Prosecutor's office on the morning of March 6, 1957. Detectives Charles DeLisle and Walter Spahr testified at the trial to such admissions.

3. Verbal admissions made first at the Prosecutor's office and thereafter at and around the scene of the homicide on the afternoon of March 6, 1957, which admissions were in the form of answers in an interrogation conducted by the First Assistant Prosecutor of Bergen County, Fred Galda. These admissions were recorded by a court reporter, were transcribed, and the transcript was read into evidence at the trial.

4. A verbal admission made by petitioner to Detective DeLisle in the Bergen County jail on March 11, 1957 with respect to the accuracy of the transcript of the interrogation on the afternoon of March 6, 1957. Detective DeLisle testified at the trial to such an admission.

5. Verbal admissions made to three psychiatrists, Drs. Zigarelli, Spradley, and Collins, during the course of their separate examinations of the petitioner. These examinations were made for the purpose of determining petitioner's sanity. The admissions were referred to during the cross-examination of petitioner at the trial and in the State's closing argument to the jury as tending to verify the admissions of March 6, 1957.

Petitioner contends that each of the separate categories of admissions was obtained in violation of his privilege against self-incrimination guaranteed by the Fifth Amendment, and hence was improperly admitted in evidence. Respondent contends that every incriminating statement was voluntary.

At the hearing on the petition twenty-eight witnesses testified, one by deposition, and fifty-six exhibits were received in evidence. From the testimony and exhibits, giving due regard to questions of credibility and the strength of recollections, I find the facts relevant to the

2. 322 F.2d 819 (3d Cir. 1963). See note 1 supra.

disposition of this petition for habeas corpus to be as set forth hereinafter.

On the morning of March 5, 1957, the body of Victoria Zielinski was discovered in a sand pit in Mahwah, Bergen County, New Jersey, near her home. She had been killed by a severe blow to the head which crushed her skull. Guy W. Calissi, the Prosecutor of the Pleas of Bergen County, took charge of the investigation, centering investigative activities at the headquarters of the Mahwah Police Department in the municipal building of that borough. Assisting Mr. Calissi in the investigation were First Assistant Prosecutor Fred Galda, a number of detectives and investigators of the Bergen County Prosecutor's office, and police officers of Mahwah and of the adjoining Borough of Ramsey. Investigation of various persons who might have been acquainted with the deceased continued through the day and into the evening. The case received widespread attention from the press, representatives of which were present at the Mahwah municipal building on the evening of March 5, 1957.

At about 10:00 p. m. John Gilroy came to the Mahwah police headquarters in the company of an officer of the Ramsey police department. He informed Mr. Galda, who was then in charge, that on the evening of the previous day, March 4, he had loaned his Mercury car to Edgar Smith after Smith, Gilroy and one Rockefeller had spent the afternoon bowling; that Smith returned the car late that evening and that on March 5 he had noticed some stains on the floor mat and seat cover; that on March 5 at Smith's request Gilroy, accompanied by Don Hommel, had picked up Smith, his wife and baby at the home of Smith's mother-in-law in Ridgewood and had driven Smith to his trailer home in Mahwah; that Smith had left his wife and baby at the trailer and accompanied Gilroy and Hommel to Ramsey; that Hommel had commented, with respect to the investigation of Victoria Zielinski's death that the police were looking for a Mercury car; that Hommel's comment

about the Mercury car had produced a startled look on Smith's face; that Smith had told Gilroy that on March 4 he had vomited on his pants and had thrown the pants away; that on the trip to Ramsey from the trailer Smith had carried a pair of shoes which he said he was taking to a shoe repair man; that Smith separated from Gilroy and Hommel for a time in Ramsey, taking the shoes with him; and that Smith was then at his mother-in-law's house in Ridgewood.

Detectives Graber and Garabedian were dispatched with Gilroy to where his car was parked. At about 10:45 p.m. they examined it, concluded that some of the stains which Gilroy pointed out could have been blood, took the floor mat, and secured the vehicle. They asked Gilroy if his tires had been changed within the last two years and he told them they had not. By this time the Prosecutor's office had had plaster impressions made of certain tire tracks near the place where the body had been found. The detectives reported back to Galda, with Gilroy, and advised him of their suspicion that the stains were blood.

Galda directed Graber and Garabedian to go to the house in Ridgewood where Smith was staying and bring him to Mahwah headquarters. Gilroy accompanied them to give directions, but remained in the car when Graber and Garabedian entered the house at about 11:30 p. m. They identified themselves as Prosecutor's detectives, told Smith that the Prosecutor would like to speak to him at the Mahwah Police Department and asked him to return with them. They had no arrest warrant. They gave no warnings of any kind, but they did inform Smith that they were bringing him in for questioning with respect to the murder of Victoria Zielinski. Smith said he was not surprised since he expected the police to question everyone with whom Victoria had been acquainted. Smith was not informed that he was free to refuse to accompany the detectives. In Garabedian's investigation report of March 12, 1957, he states that he and

Graber "picked up Edgar Smith . . . and brought him to Mahwah Police Headquarters." (Ex. R–1). Graber's report of March 15, 1957 (Ex. R–3) states: "Edgar Smith was brought back to the Mahwah police station for questioning." Beginning at 11:30 p. m. March 5, 1957, Smith was under the impression that he was in police custody, and he was in fact in such custody.

Upon arriving at the Mahwah municipal building Smith and Gilroy were asked to wait in the municipal council chamber adjoining the room used as police headquarters. In that room were policemen and several newspaper reporters. When one of the reporters attempted to interview Smith a police official chased her away. Gilroy described Smith's demeanor at about this time as cocky or self-assured.

After a short wait Smith was taken into the room used as police headquarters. At the outset of the interrogation Smith was observed by Officer Brennan of the Mahwah Police Department to be calm. He sat in a chair and placed his feet upon a desk. Mr. Galda ordered him to remove his feet. Smith asked a policeman whom he knew for a cigarette and was given one. He was questioned by Mr. Galda and other police officers including Graber and Captain DeMarco of the Bergen County Prosecutor's office. He was given no warnings. He was questioned about the information obtained from Gilroy and he admitted that he had spent the afternoon bowling with Gilroy and Rockefeller, had borrowed the Mercury car, had used it to drive to a service station for kerosene to fill the heater in his trailer, had become ill and vomited, had discarded a pair of pants on which he had vomited, and had disposed of a pair of shoes in Ramsey. During this interrogation Captain DeMarco observed an injury to Smith's fingers, which he said he incurred fixing a tail pipe. DeMarco told Smith to lift his trousers to see if he had any lacerations on the shinbones, and discovered contusions and lacerations on his knees. Smith explained that he had fallen while getting out of the car to vomit. Shortly after midnight on March 6, 1957, during the interrogation at Mahwah police headquarters, Officer Russo of the Mahwah Police Department was dispatched for a dozen coffees and sandwiches for the party at headquarters. Smith denies that he consumed either coffee or food at that time and there is no credible evidence to rebut this denial, although there is testimony from which it may be concluded that he was offered coffee and a sandwich. During the course of the interrogation on several occasions Smith was returned to the council room while Gilroy was questioned in the headquarters room. At about 2:00 a. m. on March 6, 1957, Captain DeMarco pulled from Smith's head a sample of hair. At about 2:30 a. m. Graber observed Smith's demeanor. In his words, "He was quite subdued, he was hanging his head, where he hadn't done that previously. He was very quiet." (Tr. at 209). The level of interrogation by this time was far from casual or routine. Galda had asked Smith to take a lie detector test. Calissi had asked Smith to go to the morgue. It is not clear how Smith could have aided the investigation by complying, and it must be assumed that Calissi was then seeking to wear down his resistance to meaningful interrogation. As a result of the first interrogation at Mahwah Smith was directed to accompany Galda, Captain DeMarco and Detective Graber to show them where he had vomited and where he had discarded his shoes. In Ramsey Smith disclosed the location of the shoes in a garbage can in back of some stores on Main Street. The shoes were placed in a box and impounded. A red fiber which appeared similar to the red sweater worn by the victim was found stuck to the instep of one of the shoes. Smith was then taken to the vicinity of Chapel Road and Ferndale Avenue, near the entrance to the sand pit, an area where he claimed to have vomited on the evening of March 4. No evidence of vomit was found. Smith was asked if he had ever been further back on the road into the sand pit

and denied that he had ever been back there. He observed in the road the discarded plaster bags, the contents of which had been used to make plaster impressions at the scene of the homicide.

While Smith, Galda, DeMarco and Graber were traveling about seeking confirmation of Smith's story about vomiting, Detective Russell Ridgeway and Lieutenant Charles Haight of the Mahwah Police went to Smith's trailer in an attempt to find the vomit stained pants, where Smith said he had discarded them. They had no search warrant or consent. In the garbage pail alongside the trailer they found a pair of gray cotton pants saturated with kerosene and in the trailer a pair of brown cotton gloves. These were not the pants Smith had described. (Ex. R–34).

At that point Smith was questioned by Mr. Galda and Captain DeMarco and told a different version of how and where he had discarded the pants. He explained that he had changed pants and had gone back to Pulis Avenue where he discarded the vomit covered pants. He was taken to the Pulis Avenue location, where a search for the pants was made. Smith, who was attired in light clothing, complained of being cold. The search for the plants was fruitless. Questioning with respect to the clothing Smith had worn on March 4 continued in the car, and Smith disclosed that he had worn a blue jacket which he had since washed and which was at his mother-in-law's house. Detective Graber was dispatched to that home at about 3:30 a. m. and obtained the jacket from Mrs. Smith. Galda, Captain DeMarco and Smith returned to the Mahwah police headquarters where Smith's interrogation continued. At this time Smith proffered an explanation with respect to the shoes:

" 'If its [sic] those shoes that you are worried about, I think I can explain that. * * * If those shoes have any blood on them, I can explain how it got on there * * *.' He said that when he got home and his knees were bloody, he wanted to change his shoes and his good shoes were under the bed and rather than soil the rug with his bloody knees, because his pants were off, he pulled the old shoes over by his knees and he leaned on them with his knees and pulled his new shoes out from under the bed." (Ex. R–59, pp. 481–482)

It was now between 3:30 and 4:00 a. m. Lieutenant Haight and Detective Sinatra were detailed to return to Smith's trailer and measure the kerosene in the fifty-five gallon tank beside Smith's trailer. They found it to be three-fourths full. They had no search warrant and no consent. The measurement of the tank tended to cast further doubt on Smith's version of his whereabouts on the evening of March 4. At about 4:00 a. m. Mr. Galda gave instructions to obtain powerful searchlights. Smith was taken out for a further search for the trousers on which he claimed to have vomited and for evidence of vomit. Smith was first taken by Captain Wickham, Detective Sinatra, Detective Garabedian and Detective O'Har to another location on Wyckoff Avenue near a church where he claimed to have vomited. Next he was taken to Pulis Avenue, where he was asked to assist Mr. Galda and Captain DeMarco in a search for the pants. Finally he was taken back to the area near the sand pit and asked to assist in locating vomit there. All of these searches proved fruitless. Smith was then taken back to Mahwah police headquarters.

It was now after 5:00 a. m. At 5:20 a. m. Captain DeMarco made arrangements to have Smith examined at 7:30 a. m. by the county medical examiner, Dr. Gilady. He called Investigators Nunno and Perrapato and instructed them to be at Dr. Gilady's office at 7:30 a. m. He detailed Detective Sinatra to guard the suspect. The physical evidence which had been gathered from the murder scene and elsewhere was transferred from Mahwah to the Bergen County Prosecutor's office. Gilroy was driven home. The Mahwah phase of the investigation ended at about 5:40 a. m.

With Smith in the car, Sinatra, whom Smith knew to be armed, drove DeMarco

to his home in Wyckoff so that DeMarco could refresh himself and change his clothes. Sinatra then took Smith to a diner in Midland Park where both ordered breakfast. Sinatra's best recollection is that Smith ate breakfast. Smith testified that he was too tense and ill to eat. Probably Smith did eat something, although by this time he was undoubtedly tense and ill. Smith contends that while he was with Sinatra in the diner he asked Sinatra if he could telephone his wife, or perhaps drive to his mother-in-law's home which was a few blocks away, and that Sinatra told him his instructions would not permit this. Sinatra denies that either request was made. From all the surrounding circumstances including the fact that Smith had been away from his wife all night, the geography and the fact that when he arrived at the Prosecutor's office later in the morning he made a similar request (to call his wife), which was granted, Smith's contention is more credible than Sinatra's denial. After breakfast Smith was taken back to Wyckoff where Captain DeMarco rejoined them. They then drove to Dr. Gilady's office in Hackensack where they were met by Investigators Nunno and Perrapato. Smith was given no warnings. Dr. Gilady's report (Ex. R–32) discloses and I find that Smith was stripped of all his clothing and examined for marks of injury. This examination took place in the presence of Captain DeMarco. The other four detectives were present, although not in the examining room. The doctor discovered indications of traumatic injury of recent origin on the left knee, the right knee and the left index finger. With respect to Smith's mental state he found "He was very restless and apprehensive and markedly agitated." Dr. Gilady's written report discloses that the examination took place at about 7:55 a. m. The report was received at the Prosecutor's office on March 6, 1957, exact time unknown. However, almost immediately after completing the examination and certainly no later than 9:00 a. m. Dr. Gilady telephoned the same information to Mr. Calissi or Mr. Galda.

Meanwhile at about 6:30 a. m. the Ramsey Police Department had found, in quite a different location than any to which Smith had made reference, a pair of blood stained pants. Arrangements were made to photograph the pants at that location and then to bring them to the Prosecutor's office at the courthouse in Hackensack.

At about 8:30 a. m. Detective Sinatra and others brought Smith from Dr. Gilady's office to the Prosecutor's office. About this time Mr. Galda, who was already at the office, had learned from a police source that Smith had a juvenile court record, and made efforts to obtain from the Juvenile and Domestic Court of Bergen County a copy of that record. He ultimately did obtain it (Ex. R–33) through the Midland Park Police Department.

Shortly after his arrival at the Prosecutor's office Smith's knee injuries were photographed for Captain DeMarco by a newspaper photographer. Thereafter Detectives Kikert and Garabedian took fingerprints, fingernail clippings and scrapings from Smith. Also, shortly after Smith's arrival, the bloody pants were delivered from the Ramsey Police Department. They were shown to Smith by Galda and Calissi and he denied they were his.

Shortly thereafter Smith asked for and received permission to call his wife. In the presence of one or more of the Prosecutor's staff this call was made. Smith told his wife he was in the Prosecutor's office, and that she should go to the office of Judge Dwyer, an attorney in Ridgewood, tell Dwyer who she was, tell Dwyer where he was, and ask Dwyer to get him out.

After this call was made the Prosecutor instructed Detective Graber to pick up Mrs. Smith and bring her to the Prosecutor's office. She was picked up promptly, before she had an opportunity to speak to Judge Dwyer, and taken by a

back entrance to the Prosecutor's office. She was shown the bloody pants and identified them as Smith's. Smith was made aware of her presence in the Prosecutor's office. Thereafter she was taken back to her mother's house for the purpose of finding the flannel shirt which Smith had worn on March 4 and washed on March 5. She was brought back to the Prosecutor's office with the shirt. Mrs. Smith was given no warnings of any kind. In particular she was not advised that she could not be compelled to be a witness against her husband.[3]

Some time after 9:30 a. m. Smith was placed in a smaller office. At about the same time two detectives who had not previously figured in his interrogation arrived on duty. One of them, Detective DeLisle, inquired if there was a suspect in the Zielinski homicide. Captain DeMarco informed him Smith was the suspect. DeLisle suggested that too many people were participating in Smith's interrogation, and that he should be placed in less congenial surroundings. He was thereupon placed in a small office normally occupied by Captain DeMarco. DeMarco instructed DeLisle and Detective Spahr to continue Smith's interrogation. This interrogation commenced about 10:00 a. m.

At that time the Prosecutor had evidence (1) that Smith was acquainted with the victim, (2) that he was in the vicinity of the crime on the evening of March 4, (3) that he had used a car that evening which now contained suspicious stains, (4) that he had lied about his movements that evening and in particular about vomiting on his pants, (5) that he discarded a pair of shoes to which was adhered a fiber similar to that of a sweater worn by the victim, (6) that he had discarded a pair of pants, (7) that a pair of bloody pants, identified by Smith's wife as his, were found in a location other than the place where he said he discarded his pants, (8) that he had injuries consistent with having engaged in a struggle in a sand pit, (9) that he had washed a jacket and a shirt on the morning of March 5. Smith had been the prime suspect and focus of the investigation since 4:00 a. m. at the latest. Clearly the Prosecutor at 10:00 a. m. had sufficient information to charge Smith with murder, and to have him taken before a committing magistrate. The Prosecutor admitted that he was well aware of the New Jersey requirement that persons taken into custody be brought promptly before the nearest available magistrate.[4] The Prosecutor's office was in a courthouse where there were numerous judges, any one of which could properly have acted as a magistrate. At such an appearance it would have been the duty of the court to advise Smith of his right to counsel, his right to appointed counsel in a homicide case, his right to remain silent, the use to which any statement he made could be put and his right to make a statement not under oath.[5]

There were, however, certain evidentiary holes in the State's case. First, Mrs. Smith could not be compelled at a trial to testify against her husband.[6] Thus the identification of the bloody pants might be difficult. Second, no one placed Smith in the sand pit with the victim. Third, even if the pants

---

3. See L.1900, c. 150, p. 363, § 5, as amended, L.1940, c. 22, p. 96, § 1, as amended, L.1953, c. 231, p. 1695, § 1 repealed, L. 1960, c. 52, p. 465, § 49. The marital privilege is now governed by Rule 23(2) of the New Jersey Rules of Evidence.

4. N.J.R.R. 3:2–3(a) (1953), as amended, R.R. 3:4–1 (1969), required that a person arrested without a warrant be brought "without unnecessary delay, before the nearest available magistrate." As contrasted with the federal courts, noncompliance with this rule does not vitiate a confession subsequently obtained. Compare Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), with State v. Taylor, 46 N.J. 316, 328, 217 A.2d 1, cert. denied, 385 U.S. 855, 87 S.Ct. 103, 17 L.Ed.2d 83 (1966).

5. N.J.R.R. 3:2–3(b) (1953), as amended, R.R. 3:4–2 (1969).

6. See note 3 supra.

were identified as Smith's and blood typing associated the blood stains with the victim, placing Smith with her, there was not sufficient evidence of the surrounding circumstances to show premeditation. Thus despite the mandatory language of N.J.R.R. 3:2–3(a) Smith was not taken before a magistrate and the interrogation continued. The purpose of the interrogation after 10:00 a. m. on March 6, 1957, was not to determine who committed the offense, but to obtain evidence of first degree murder.

Shortly before this new interrogation began, but after he had been confronted with the bloody trousers, and had been photographed, fingerprinted and had had his fingernails scraped and clipped, and after he spoke to his wife on the telephone about an attorney, and after she had arrived at the Prosecutor's office too soon to have called an attorney, Smith, by this time transferred to the smaller DeMarco office, said, "I am getting out." He started to get up but was pushed by Detective Spahr into a chair and fell backwards onto the floor. Thereafter Spahr noticed a small bloodstain on the collar of his T-shirt. Spahr ordered that his clothing be removed and prison coveralls were substituted.

Spahr and DeLisle conferred outside Smith's presence on an agreed line of questioning of the suspect. They were both experienced interrogators. It was agreed that at an appropriate point in the interrogation DeLisle would afford the suspect, unexpectedly, an opportunity to state any justification for what had happened by asking "What did she do to you?" or something to that effect.

Spahr explained the technique which was pursued, both in his 1957 report (Ex. R–47) and in his testimony in this proceeding. First it was necessary to establish a common ground with the suspect. In Smith's case, after obtaining some personal history, this proved to be religion. Their common faith, and the fact that DeLisle also was of the same faith, though not practicing, served this purpose. At the same time it was necessary to maintain an authoritarian position between interrogator and suspect. This was accomplished by discussing in detail all the scientific aids which would enable them sooner or later to solve this crime. The suspect was led into a discussion of degrees of murder and the ensuing penalties. Reference was made to a file on another homicide, the Ledwin or Ludwin case, in which a man had killed his brother. Spahr explained that all murders are presumed to be second degree, and "there is a case where this man killed his brother and look what he got" (seven years) (Tr. 360). Then Spahr mentioned that whoever committed the act must have done so with great provocation. At this point, as planned, DeLisle asked, "What did she do to you?" Smith answered, "She hit me." The cat was out of the bag. Smith broke down and cried.

The interrogators then spoke with Smith about whether he wanted to see a priest for confession. Smith asked for a specific priest from Don Bosco High School in Ramsey. The Prosecutor was informed of Smith's breakdown. He agreed that the priest should be summoned, and sent a staff member to pick him up. Smith was given a cigarette and a glass of water. The interrogation continued, and Smith gave an incomplete but incriminating verbal statement which is recorded in Spahr's report (Ex. R–17) and to which Spahr testified at the trial. This statement admitted Smith's presence in the sand pit and an altercation with the victim, but did not admit killing in as many words and claimed a blackout or loss of memory for the crucial period following the altercation.

A priest, not the one for whom Smith had asked, but one of similar name, arrived at the Prosecutor's office some time after 11:00 a. m. He was admitted through the same rear entrance through which Mrs. Smith had been admitted.

Smith was permitted to confer with the priest in a private room.

There is a dispute in the testimony as to whether Smith was on March 6, 1957, permitted to speak with his wife. If such a conversation took place on March 6, it took place either immediately before he was closeted with the priest, or immediately thereafter. Galda's recollection, which I find the most credible is that he authorized a meeting between husband and wife in his presence, which took place immediately before the priest's visit, on March 6. At this meeting, confronted with his wife's prior identification of the bloody pants, Smith admitted they were his. (Tr. at 577–78).

Clearly now the time had come to charge Smith and take him before a magistrate. Instead, at about this time Detective Ridgeway was detailed to procure motion picture equipment to be used when Smith re-enacted the crime. He rented such equipment at 11:30 a. m. (Ex. R–34).[7] Smith had not been asked if he would be willing to undertake any such re-enactment.

The judiciary was not left out of the picture, however, for while Smith was closeted with the priest, Calissi and Galda conferred with the Honorable Wallace Leyden, a judge of the Superior Court of New Jersey, and the Assignment Judge of Bergen County. They advised him of their desire to continue interrogation of the suspect. Instead of directing the Prosecutor to take the suspect before a magistrate, Judge Leyden arranged for a member of the petit jury panel currently sitting to be dispatched to the Prosecutor's office to serve as a "disinterested witness" to Smith's further interrogation. He also arranged that one of the regular court reporters serving the courts in the building be relieved from his regular assignment in order to record the interrogation.

The desk in the Prosecutor's office was at that time equipped with two telephones. One of these was a dummy telephone containing a concealed microphone. The microphone was connected by concealed wire to a tape recorder in an adjoining room. Spahr was instructed to set up the recording equipment with magnetic tape and he did so. It was arranged that Smith's further interrogation would continue in the Prosecutor's office, with Galda asking the questions and Calissi monitoring the recording equipment. The existence of the concealed microphone was not revealed to Smith.

Smith was told the Prosecutor was going to take a statement. He was given no warnings. He was brought into the Prosecutor's office at 12:50 p. m. Present besides Galda were Louis M. Kalstad, the "disinterested witness" procured from Judge Leyden, Arthur J. Ehrenbeck, the court reporter, Charles E. Smith, Chief of the Mahwah Police Department, Harry Voss, Chief of the Ramsey Police Department, and Spahr, the recently successful interrogator. These people were introduced. Kalstad was introduced as "from the jury panel of the Second State Session." Smith was asked, and answered:

"Are you willing to give a voluntary statement concerning this incident? A. Yes.

Q. Are you willing to give the statement under oath, Ed? A. Yes."

He was sworn. Mr. Galda then undertook an interrogation about Smith's movements on March 4. Smith's answers embroidered upon the admissions he had previously made. At first he admitted only to the same altercation which he had admitted to Spahr, and continued to claim loss of memory. He was encouraged to detail his movements on the morning of March 5, and he spoke

---

7. Due to technical difficulties with the camera the film footage was never successfully developed.

about a conversation with Gilroy from a phone booth, and said:

"I went back in. That's when it dawned on me that I had been with her the night before and something snapped in the back of my head that I did it and I knew it in the back of my mind." (Ex. R–26, p. 19).

He was asked to continue the recital of the occurrences of March 5, and with respect to the conversation between Smith, Gilroy, and Hommel said:

"First thing I said when I came out of the house I said to this fellow Don, I said, 'Was that Vickie that got killed?' I guess I was asking as if I didn't know myself, and he said, 'Yeah.'

He said 'The place up there is swarming with cops and checking the registration of every Mercury registered in Bergen County.'

That's when it hit me really hard I must have been the one who really did it." (Ex. R–26, p. 19).

The quoted admissions took place at about 1:20 p. m. They were the first, and the only time that Smith actually admitted doing anything more than striking the victim once with his hand. The interrogation in the Prosecutor's office was transcribed by Ehrenbeck, and was also recorded on magnetic tape by Calissi. It continued until 2:15. Smith identified various incriminating exhibits and made further admissions as to his activities in and around the sand pit.

The transcript of Ehrenbeck's stenographic notes was read into evidence at the trial. The existence of the magnetic tape transcription was never revealed to anyone outside the Bergen County Prosecutor's office until about a month before the instant hearing. It comprises Exhibits R–23, 24 and 25 in this proceeding, and was played in open court. At several points in the transcription, especially those parts coinciding with pages 24, 28, 29, 31 and 32 of the transcript, Exhibit R–26, Smith's voice shows evidence of considerable tension. At pages

40 and 41 of Exhibit R–26, and in the equivalent part of the magnetic tape transcription, Galda attempted to obtain an elaboration of the altercation, and admissions of sexual advances, but Smith, obviously tense, retreated to lack of recollection. Pressed to recall his blood stained clothing, he became evasive and equivocal. (Ex. R–26, p. 42). At this point Galda suggested a recess. The magnetic transcription discloses that Smith used the toilet in a small adjoining lavatory. Calissi joined the group. Galda resumed interrogation at 2:13 p. m. At page 43 of Ex. R–26 and in the corresponding part of the magnetic transciption appears:

"Q. What we are going to do now, on the places you indicated to us, we are going to go to the area. It will be with the same people in this room and we are going in two cars and you can point out these things you mention on the spot. Is that agreeable to you?

A. Yes.

Q. And while you were in the custody of the policemen and up at the Mahwah Police Headquarters, did anybody misteat you or anything?

A. No, sir.

Q. Everybody treat you all right?

A. Better than I expected."

Galda then elicited an admission that Smith was sober on the evening of March 4. Smith was not told that arrangements had been made for the proposed re-enactment trip as early as 11:30 a. m. The Ehrenbeck transcript of proceedings at the Prosecutor's office ends at this point, at 2:15. The magnetic transcription continues, however, beyond the time covered by R–26.

At 2:15 the corridor and rotunda of the Bergen County Court House contained a large crowd of newspaper reporters and spectators. Smith was told there was a big crowd out there and he

would have to go through the crowd because there was no other way to get out. He was not told of the rear entrance used by Mrs. Smith and by the priest. Galda said, "You follow me and we'll go right through." Calissi said there was no way of sneaking out of the place and that the crowds could not be kept out because it was a public building. Galda said, "Eddie we're not going to put handcuffs on you or anything." He also said, "I think you ought to shave." He gave Smith an electric razor and instructed him to shave, which Smith did.

Numerous photographs taken of Smith after he left the Prosecutor's office on March 5, 1957, show him clean shaven and in clothing other than the prison coveralls which he wore while being interrogated by Spahr. Thus at some point before he was exposed to the press Smith's prison coveralls were removed and his own or some other outerclothing substituted.

Smith was taken out through the rotunda and main entrance of the Bergen County Court House, where he was photographed by press photographers. Exhibit P-4, a United Press International Photograph, shows Smith entering a car outside the Bergen County Court House. He appears fatigued. He was placed in a car in the company of several detectives, Galda, Kalstad, and the court reporter Ehrenbeck, who continued to record the ongoing interrogation. Galda caused Smith to identify landmarks in the vicinity of the sand pit, such as the place where he picked up Victoria Zielinski and the place where he drove Gilroy's car into the driveway of the sand pit. That the purpose of the interrogation was to obtain evidence which would sustain a first degree murder charge is clear. For example:

"Q. Did you pull in on your own accord without any suggestion?

A. I did." (Ex. R-26, p. 47)

Smith was subjected to a rather rigorous examination with respect to his story of the altercation, the questions seeking to establish the possibility of premeditation. He was asked to identify property of the victim found at locations which he pointed out. He admitted having returned to the sand pit with a searchlight. Smith was photographed in the vicinity of the murder scene by press photographers and by Ridgeway's motion picture camera.[8]

Smith was then taken to the trailer camp where he lived. The party arrived at the trailer at 3:32 p. m.

The party then returned to the sand pit at 3:40 p. m. At 3:42 p. m. they returned to the trailer and obtained the five gallon kerosene can which Smith said he used on March 4. There was no search warrant. There were no warnings. The party concluded its business at the trailer at 3:45 p. m. and proceeded to the Mahwah police headquarters. At Mahwah Smith was again photographed by the press.

At Mahwah a complaint charging Smith with the murder of Victoria Zielinski was drawn. Thereafter at about 5:00 p. m. he was brought before Magistrate Young of the Mahwah Municipal Court, the charge was read, and the warnings which N.J.R.R. 3:2-3(b) required were given. Smith asked for and was denied bail. At the rear of the courtroom after his appearance before the magistrate he was posed for news photographs.

Smith was next taken by several detectives to dinner at a Hackensack restaurant. The prosecutor joined the dinner party. A reporter was permitted to be near enough to the party to overhear the conversation and observe Smith's demeanor. After dinner Smith was remanded to the Bergen County jail.

Upon instructions of the Prosecutor's office Ehrenbeck forthwith prepared a

8. See note 7 supra.

transcript of his notes of Smith's interrogation. Based on information obtained from the Prosecutor's staff he captioned the transcript:

STATE OF NEW JERSEY
v.
EDGAR H. SMITH
Defendant [9]

Charge: Murder

He delivered the ribbon and three carbon copies to the Prosecutor's office on or about March 8, 1957.

The Prosecutor was aware that Smith's family had retained Joseph Gaudielle on March 7, 1957. Gaudielle informed the Prosecutor that he had given Smith instructions not to sign any statement. Nevertheless, on March 11, 1957, Captain DeMarco instructed Detective DeLisle to take the Ehrenbeck transcript to the Bergen County Jail for the purpose of having it signed. DeLisle handed Smith a copy and told him "I want you to read it, make any errors or corrections or additions to it you might want to, and sign it." (Tr. at 782). Smith read the statement. He was again asked to sign it, but refused because his lawyer had advised him not to do so. In DeLisle's words:

"It was then that he said to me that he was amazed at the ability of the Court reporters to be able to catch everything that was said, and he just thought it was a wonderful thing that they could [sic] this ability." (Tr. at 783).

This version is slightly at variance with that to which DeLisle testified at the trial. There he said:

"I asked him if the statement was accurate and he said 'Yes, it was accurate.'

He commented upon how accurate it was and it was amazing that the court stenographer could take down with such accuracy such a statement." (Trial tr. at 521).

The difference between the two versions is significant, for the State trial testimony was elicited for the purpose of complying with the rule of State v. Cleveland, 6 N.J. 316, 78 A.2d 560 (1951) [10] and thereby making the Ehrenbeck transcript (Ex. P–84 in the trial record) admissible in evidence as a confession. The state trial court, on the basis of DeLisle's testimony, admitted this transcript in evidence. The less precise version testified to before this court might have produced a different ruling.[11]

On March 8, 9, and 11, 1957, Smith was transferred temporarily from the Bergen County jail to the Prosecutor's office. In each instance the transfer was accomplished by virtue of a written request from the Prosecutor addressed to Hon. Arthur J. O'Dea, Presiding Judge of the Bergen County Court. Each requisition was approved in writing by Judge O'Dea. (Exhibits P–7, –8, –9, –10). The purpose of these transfers was to have Smith examined by three state appointed psychiatrists for the purpose of determining his sanity. The Prosecutor discussed these examinations

9. At one point at least in the magnetic transcription the Prosecutor referred to Smith as the defendant.

10. This rule governs the admissibility of written confessions and provides that "until the statement is signed or its correctness acknowledged in some fashion by the defendant, it constitutes merely a memorandum of what was said and is

inadmissible in evidence." 6 N.J. at 329, 78 A.2d at 567.

11. There can be no doubt that the admission of Ex. P–74 in evidence had a prejudicial effect beyond the oral testimony of Ehrenbeck as to the same admissions. "A thing in writing carries, particularly with laymen, a weight of its own." Springer v. Labow, 108 N.J.L. 68, 70, 155 A. 476, 477 (S.Ct.1931).

with Frank Boggia, assistant to Mr. Gaudielle, who consented. Dr. Collins, who conducted the first examination on March 8, 1957, also spoke to and obtained consent from Mr. Gaudielle,[12] who remained present while Collins spoke to Smith. With respect to the three examinations Mr. Calissi was asked:

"Q. Was there any agreement between you and Mr. Gaudielle as to the use to which the reports of these examinations, or the content of these examinations would be put.

A. No, sir. This was a kind of a routine matter in a case of this kind. First, it was my impression that it was necessary to find out what the mental status of an accused was at the time of the commission, in order that I discharge my duties properly in determining the degree. And, as I said, Mr. Gaudielle had absolutely no objection to—in fact, I believe he was at one of them, he was there. And, of course, we left before the examination took place. And I don't remember which it was, but it was the first one. And he knew there were going to be two others after that." (Tr. at 1026).

During the three examinations Smith was asked about his claimed loss of memory as to some events of March 4, and while sticking to that version, repeated some of the incriminating statements he had theretofore made. The incriminating admissions to the psychiatrists were elicited from Smith when he took the stand at his trial and were referred to in the Prosecutor's closing address as corroborative of his confession.

Gaudielle did not represent Smith at the trial. John E. Selser, the attorney who did represent him, testified in these proceedings. In 1957 he was an experienced criminal defense attorney in Bergen County, a former First Assistant Prosecutor of that county and a former Deputy Attorney General. He testified that in 1957 it was the common practice ". . . to anticipate the possible defense of insanity and in every such case Dr. Collins or other competent psychiatrists were called by the Prosecutor to make an appraisal as to the psychotic health of the accused." (Tr. at 1255). He testified:

"Q. What was the purpose of these examinations, sir?

A. Appraisal of the psychotic status of the accused.

Q. Was there any other purpose?

A. No.

Q. Was that purpose understood by the Bar?

A. Yes.

\*    \*    \*    \*    \*    \*

Q. What was the understanding of the Bar as to that use?

A. The understanding of the Bar was very definitely a program to arm the prosecution as against the possible defense of insanity, and for no other purpose."

There is no direct conflict between Mr. Calissi's testimony that "[t]his was a kind of routine matter in a case of this kind" and Mr. Selser's testimony as to the understanding of the Bar. Moreover only such an understanding as that to which Mr. Selser testified would explain Mr. Gaudielle's willingness to permit his client to make incriminating statements to the psychiatrists after advising him not to sign a statement and informing the Prosecutor that he had so advised him. Judge O'Dea's signature on the requisition orders is also consistent with such an understanding, for it is inconceivable that the court would order the production of a represented defendant for interrogation for purposes of incrimination beyond the issues of criminal responsibility and present sanity. This understanding is consistent with N.J.S. 2A:163–2 and the procedure under that

---

12. Mr. Gaudielle is deceased and thus his version of this consent could not be adduced in the instant proceeding.

statute later formally elaborated in State v. Whitlow, 45 N.J. 3, 210 A.2d 763 (1965).[13] The statements made to the three psychiatrists Drs. Collins, Spradley and Zigarelli, in March of 1957 were made pursuant to such an understanding.

■ The foregoing recital, then, sets forth the historical facts from which must be determined the ultimate issue of voluntariness for federal constitutional purposes. The November 30, 1970, opinion of this court, referred to earlier, requires that this opinion discuss the evidentiary standard applied in making findings both of historical facts and of the ultimate issue. That opinion held that the respondent would in this hearing have the burden of proving voluntariness.[14] It did not, however, decide which evidentiary burden respondent must meet. Three alternatives are possible. Respondent (nominally the Warden of the State prison but actually the State) might be required to prove voluntariness beyond a reasonable doubt. This would be its burden in a criminal trial in New Jersey. State v. Franklin, 52 N.J. 386, 245 A.2d 356 (1968); State v. Yough, 49 N.J. 587, 231 A.2d 598 (1967).[15] Respondent might be required

to meet the standard of "convincing evidence." This standard applies to a habeas corpus petitioner in those cases in which, because none of the eight criteria specified in 28 U.S.C. § 2254(d) have been met, the burden rests upon him to show that the state court factual determination was erroneous. Finally respondent might be entitled to prevail on no more than a preponderance of the evidence. Research has disclosed no case deciding the point. It is discussed but not reached by Judge Mansfield in United States ex rel. Castro v. LaVallee, 282 F.Supp. 718, 723 (S.D.N.Y.1968).

The question arises, of course, because of this court's prior ruling, which is law of the case, that when the petitioner establishes by reference to the state court record one of the criteria of 28 U.S.C. § 2254(d), the respondent must bear the burden of proof. Perhaps one could distinguish between the burden of going forward (risk of failure to produce evidence) and the burden of persuasion (risk of failure to persuade by the applicable evidentiary standard) and hold that the later burden remained on petitioner. We conclude, however, that Judge Barlow's prior ruling for this

13. "If an adequate opinion cannot be formed without inquiry into the circumstances attending the alleged crime, the inquiry should be made. The defendant should cooperate therein fairly, unless he lacks mental capacity to do so. The evidentiary character of any inculpatory statements shall be limited expressly to the issue of insanity, and shall not be admissible on the issue of guilt." 45 N.J. at 26, 210 A.2d at 775.

14. This ruling was an interpretation of 28 U.S.C. § 2254(d). That subsection states that factual determinations made by a state court shall be presumed to be correct unless the applicant shall establish one of eight enumerated circumstances or such shall otherwise appear. One of these circumstances is
"(3) that the material facts were not adequately developed in the State court hearing."
The November 30, 1970 ruling of this court held that material facts were not adequately developed in the state court record. Section 2254(d) goes on to say:
"And in an evidentiary hearing in the proceeding in the Federal court . . .

unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant . . . the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."
The opinion reasoned that only in the absence of all the listed instances did the presumption and burden of proof specified in § 2254(d) apply, and that where one of the listed criteria appeared the respondent had the burden of proof.

15. See also Pea v. United States, 130 U.S. App.D.C. 66, 397 F.2d 627 (D.C.Cir. 1968) and the cases therein cited, which discuss whether the government must show the voluntariness of a confession beyond a reasonable doubt before it may be admitted in evidence. These cases were all direct reviews of convictions and are not authority for the proposition that a habeas corpus court should impose the same burden on the State as it would have to meet in a criminal trial.

court rejected such an approach, and placed on the State both the burden of going forward and the burden of persuasion.

That ruling should not, however, in this collateral attack on a judgment of conviction, have the additional effect of imposing on the State the same burden it had to meet to obtain the judgment in the first instance. Petitioner's contention that the State must prove voluntariness beyond a reasonable doubt is therefore rejected. If none of the criteria listed in 28 U.S.C. § 2254(d) applied, the habeas corpus petitioner would have had to meet the evidentiary standard of convincing evidence. Because of deficiencies in the record developed in the state court on the critical issue of voluntariness the petitioner has been relieved of that burden. A persuasive case can be made for requiring the State, in these circumstances, to meet the same convincing evidence test. In the absence of a binding precedent, however, this fact finder has assumed that the State need only persuade by a preponderance of the evidence. The factual findings set forth hereinabove were made pursuant to that standard. Few of these facts are seriously disputed in any event. The real dispute is the ultimate conclusion to be drawn from such facts. Substantially the same factual findings and certainly the same ultimate conclusion would be reached if the burden of persuasion rested on the petitioner.

■ If Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were applicable to this case the violation of each of the prophylactic rules for custodial interrogation laid down in that case would require issuance of the writ. *Miranda* is not retroactive. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). However a pre-*Miranda* confession is judged by whether, considering the totality of the circumstances, it was voluntarily given or was the result of overbearing by the police. See, e. g., Clewis v. Texas,

386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed. 2d 423 (1967) ; Davis v. North Carolina, 384 U.S. 737, 739, 86 S.Ct. 1761, 16 L.Ed. 2d 895 (1966) ; Fikes v. Alabama, 352 U.S. 191, 197–198, 77 S.Ct. 281, 1 L.Ed. 2d 246 (1957). Since it became clear in Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), that admission of a coerced confession violated the due process clause of the Fourteenth Amendment, the substantive test of voluntariness has become increasingly meticulous. Physical brutality was the first type of coercion to which the federal courts gave attention. See Brown v. Mississippi, *supra*; cf. Brooks v. Florida, 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed. 2d 643 (1967). But "[s]ince Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, [the Supreme] Court has recognized that coercion can be mental as well as physical, that the blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). "When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or mental ordeal." Watts v. Indiana, 338 U.S. 49, 53, 69 S.Ct. 1347, 1350, 1357, 93 L.Ed. 1801 (1949). The decision to confess must be freely as well as rationally made. Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

> "[A] confession is [not] 'voluntary' simply because the confession is the product of a sentient choice. 'Conduct under duress involves a choice,' and conduct . . . not leaving a free exercise of choice is the product of duress as much so as choice reflecting physical constraint." Haley v. Ohio, 332 U.S. 596, 606, 68 S.Ct. 302, 307, 92 L.Ed. 224 (1948).

The choice must be the voluntary product of a free and unconstrained will. Haynes v. Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

It is true that in each case in which the Supreme Court has held that the totality of circumstances disclosed a con-

fession to be the product of coercion [16] the presence or absence of some single fact may serve to distinguish petitioner's precise situation. The assessment of voluntariness, however, "requires more than a mere color-matching of cases." Reck v. Pate, 367 U.S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948 (1961). Reference to factual configurations in similar Supreme Court cases reveals what must be considered impermissibly coercive as a matter of law. Guided by those factual configurations this court must determine in the first instance whether the will of Edgar Smith was overborne by the acts of the various law enforcement officials. This determination must look to the totality of circumstances as well as to the established legal significance of each individual circumstance.

The crucial interrogation in this case was that conducted by Spahr and DeLisle beginning at about 10:00 a. m. on March 6, 1957. No case has come to our attention in which since Chambers v. Florida, *supra*, any federal appellate court, on a record disclosing the totality of circumstances surrounding that interrogation, approved of the use of the resulting admissions. Those circumstances include the absence of *Miranda*-type warnings; the knowledge on the part of the prosecuting authorities that Smith wanted counsel and Smith's knowledge that his effort to reach an attorney had been frustrated; [17] the fact of continu- ous custody from 11:30 p. m. on March 5, 1957; the fact of intermittent but substantially uninterrupted, incommunicado interrogation for most of the intervening time; the submission to a naked physical examination; the taking of hair samples, fingernail pairings and fingerprints; the removal of his clothing and the substitution of prison garb; the forcible physical reaction to Smith's one effort to leave; the confrontation with the bloody pants; the continuation of interrogation after Smith's wife identified the pants as his; the substitution of a new relay of interrogators; Smith's gradual deterioration of spirit from cocky and confident at 11:30 p. m. on March 5, to subdued at 2:30 a. m. on March 6, to very restless and apprehensive and markedly agitated at 7:55 a. m. on March 6, to broken and crying when finally trapped into an incriminating admission after 10:00 a. m.; the interrogators' preconceived scheme for trapping Smith into a damaging admission, including their appeal to religion, their indication of the certainty of scientific detection; and the suggestion of leniency implicit in the reference to the Ledwin case.

Shedding light on the essentially coercive nature of the Spahr-DeLisle interrogation is the subsequent conduct of the Prosecutor who, instead of taking Smith before a magistrate at a time when under the applicable state court rule this

16. See Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); Brooks v. Florida, *supra*; Clewis v. Texas, *supra*; Davis v. North Carolina, *supra*; Haynes v. Washington, *supra*; Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1962); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L. Ed.2d 1265 (1959); Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Fikes v. Alabama, *supra*;

Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949); Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); Watts v. Indiana, *supra*; Haley v. Ohio, *supra*; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Ashcraft v. Tennessee, 322 U.S. 143, 64 S. Ct. 921, 88 L.Ed. 1192 (1944); Ward v. Texas, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942); White v. Texas, 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940).

17. Cf. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

was clearly required, continued the incommunicado interrogation for an additional six hours for the purpose of obtaining additional incriminatory statements.

The admissions made to Detective Spahr and DeLisle on the morning of March 6, 1957, were the results of a cumulation of coercive circumstances which made those admissions involuntary under federal constitutional standards. Moreover, the totality of circumstances, beyond the sum of component facts, compels me to find that these admissions were involuntary. The admission of the testimony of Spahr and DeLisle at Smith's trial violated the due process clause of the Fourteenth Amendment.

The Ehrenbeck transcript (Ex. R–26 (Ex. 3–84 in the trial record)) stands on no better footing. The coercive circumstances increased by the time the interrogation reflected therein commenced. Adding to circumstances already alluded to was the presence of a juror and an official court reporter both so identified to Smith. Smith must have been left with the quite correct impression that even the judicial machinery was allied with the Prosecutor in his ongoing interrogation. The calculated steps taken to give an appearance of voluntariness during this interrogation are not convincing. They tend as much to shed light on the essentially coercive atmosphere as to show that Smith was acting voluntarily. The admissions made by Smith on the afternoon of March 6, 1957, at the Prosecutor's office, at the murder scene, and at the trailer, were all the result of coercion, and their admission at the trial violated the due process clause of the Fourteenth Amendment.

Independent of the coercive circumstances surrounding the interrogation reflected in the Ehrenbeck transcript, there was no break in the chain of events between that interrogation and the admissions made to Spahr and DeLisle. This alone is enough to make the later confession inadmissible. Darwin v. Connecticut, 391 U.S. 346, 349, 351, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

The "acknowledgement" admission made to DeLisle in the Bergen County jail on March 11, 1957, must next be considered. That incident falls squarely within the holding of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Were I free to do so I would apply *Massiah* retroactively to this case. That course is ruled out by United States ex rel. Allison v. New Jersey, 418 F.2d 332 (3 Cir. 1969), cert. denied, 400 U.S. 850, 91 S.Ct. 68, 27 L.Ed. 2d 88 (1970), holding *Massiah* to be non-retroactive, although it could have been decided on the ground that it involved the equivalent of a guilty plea. See McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); cf. Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

But in this case, in any event, the "acknowledgement" obtained so as to make the Ehrenbeck transcript admissible in evidence was the fruit of the prior coercive questioning, and the prior illegality was not attenuated by intervening events. To the contrary, this was a clear case of an attempt to exploit the illegally obtained transcript. Cf. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Use of the verbal acknowledgement in order to qualify the Ehrenbeck transcript for admission in evidence as a written confession violated the due process clause of the Fourteenth Amendment.

Finally there is the use made at trial of the admissions made to the psychiatrists. These, too, were so directly related to the admissions elicited on March 6 that they could not properly have been availed of. The fact that they were brought out at the trial on cross-examination of Smith puts them in no better footing. They resulted from the chain of coercive events. Harrison v. United States, 392 U.S. 219, 88 S.Ct.

2008, 20 L.Ed.2d 1047 (1968). Moreover, as found hereinabove, the examination by the psychiatrists took place pursuant to an understanding of the Bar that amounted to informal compliance with N.J.S. 2A:163–2. The examinations were facilitated by court orders transferring the prisoner from the jail to the Prosecutor's office. They could have been ordered. State v. Whitlow, *supra.* Use of incriminating statements obtained in such circumstances is impermissible. Cf. Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed. 2d 678 (1964). The actual use of compelled incriminatory statements was never permitted, even under Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908) and Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947). The use made in Smith's trial was far more than mere prosecutorial comment. The admissions to the psychiatrists were used to authenticate the truthfulness and voluntariness of other statements improperly admitted.

The respondent presented the testimony of the same three psychiatrists in this hearing. Each stated his expert opinion that the admissions made by Smith on March 6 were the result of his free will and rational choice. I have taken this testimony into account despite the fact that it was strenuously objected to on most of the usual grounds advanced in opposition to the use of expert testimony. On all the evidence I have reached a conclusion different from that proposed by these experts. Expert opinion evidence is valuable on the ultimate issue to be decided only to the extent that the expert can by reasoned exposition demonstrate to the trier of fact the factual basis for his opinion. The testimony of the psychiatrists, rested upon an examination of Smith held for a different purpose over thirteen years ago, and on inferences to be drawn from written materials only some of which are in evidence. No convincing demonstration of the likely truth of their conclusions was made. Indeed in some instances their testimony acknowledged

the presence of coercive factors during Smith's interrogation. Thus, while giving due regard to their testimony I have rejected their proposed conclusions on the ultimate issues decided in this proceeding.

The writ of habeas corpus will issue unless within sixty days of the date hereof the State of New Jersey shall grant to the petitioner Edgar Smith a new trial on the indictment charging him with the murder of Victoria Zielinski, at which none of the admissions made by him on the morning of March 6, 1957, to Detectives Spahr and DeLisle, the admissions in the Ehrenbeck transcript, the "acknowledgement" of that transcript made to Detective DeLisle on March 11, 1957, or the admissions made to Drs. Collins, Spradley and Zigarelli in March of 1957 shall be admitted in evidence.

It is so Ordered.